882 So.2d 1193 (2004)
Jimmy R. WILLIAMS, Plaintiff-Appellant
v.
MARK JOHNSON PLUMBING, Defendant-Appellee.
No. 38,954-WCA.
Court of Appeal of Louisiana, Second Circuit.
September 22, 2004.
Rehearing Denied October 21, 2004.
*1194 Street & Street by C. Daniel Street, Monroe, Appellant.
Crawford & Anzelmo by Donald J. Anzelmo, Monroe, Appellee.
Before CARAWAY, DREW and MOORE, JJ.
CARAWAY, J.
In this workers' compensation case, the injured employee returned to work with a new employer receiving approximately one-half of his former wages, instead of returning to a modified position with his former employer, the defendant. The defendant was willing to accommodate the employee's physical disability because of his expertise as a journeyman plumber and *1195 to pay him his former wages. The employee chose not to return to work as a plumber and brought this claim for supplemental earnings benefits ("SEB's") and an increase in the amount of the prior weekly wage benefits that had been paid by the defendant. The workers' compensation judge ("WCJ") rejected the claim for further SEB payments but increased prior wage benefit payments which were miscalculated. The employee appeals the court's denial of SEB's and seeks penalties and attorney fees for the miscalculation of benefits. For the following reasons, we affirm the rulings of the WCJ.

Facts
Jimmy Williams, age 55, was a journeyman plumber with twenty-five years of experience. Williams had worked for Mark Johnson Plumbing ("MJP") since 1999. His job duties required him to lift fixtures such as water heaters or tubs weighing in excess of 150 pounds and to use heavy equipment and a shovel. He also had to crawl, bend or stoop on a regular basis.
On July 10, 2001, Williams was using a 30-pound drill. As he was pushing the drill, he injured his back. The fact of the injury is undisputed in this action. MJP paid for Williams to see an orthopedic specialist, Dr. Rifat Nawas, and a neurosurgeon, Dr. Anil Nanda. Williams did not need surgery on his back, but the doctors restricted Williams from working due to his injury.
MJP's workers' compensation insurance carrier, LUBA, commenced paying Williams $289.00 per week in indemnity benefits. These benefits, in the form of temporary total disability benefits and SEB's, were paid until the end of June 2002. Initially, Williams questioned the amount of the wage benefit payments and filed a claim with the Office of Workers' Compensation ("OWC"). Williams was earning $14.00 per hour at the time he was injured. In a 40-hour week, his gross pay was $560.00. He testified that he was a full-time employee and that he usually worked 40-hour weeks. Mark Johnson, the owner of MJP, agreed that Williams was a full-time employee. The record contains Williams' payroll records for the six weeks prior to his accident, reflected as follows:

 Weekly Weekly
 Dates Hours Salary
 July 6  July 12, 2001 17 $238.00
 June 29  July 5, 2001 32 $448.00
 June 22  June 28, 2001 35 $490.00
 June 15  June 21, 2001 42 $602.00
 June 8  June 14, 2001 40 $560.00
 June 1  June 7, 2001 40 $560.00

After mediation of Williams' initial claim at the OWC, LUBA raised his indemnity payment to $350 per week. However, in the present action, Williams again contested the accuracy of this amount.
In late March 2002, Williams underwent an extensive functional capacity evaluation ("FCE"). The FCE states that Williams gave maximum consistent effort on the tests. Based upon the results, the evaluating therapist gave these recommendations:
1) According to the U.S. Department of Labor, the client falls into a light work category which consists of exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly.
2) Recommend work conditioning to increase [upper extremity] and [lower extremity] strength and endurance and activity tolerance. Would also address general conditioning as client has been off of work for 8 months and it is assumed that he is deconditioned. As client fell between a light and medium work category, another goal would be to progress him into a medium work category. Other goals would be education on body mechanics, ergonomics, etc.

*1196 3) Recommend vocational rehabilitation as it is unlikely that client would be able to match the provided job functions of lifting and carrying 100-200 pounds.
Another segment of this report compared Williams' capabilities with the demands of his job for MJP and stated definitively that Williams was unable to perform the floor to waist lift, overhead lift and carrying duties formerly required of him. Dr. Nanda signed off on this report with the notation "Agree with FCE" on April 5, 2002. Williams never underwent work conditioning.
Under these restrictions, Williams commenced working on May 1, 2002, for another employer, the Squire Creek Country Club, as a gardener. He was a full-time employee of the club and earned $7.00 per hour. In addition, he had a benefit package that included health insurance, an employer-matched IRA plan, eight furnished uniforms worth $50 each, furnished lunches, a two-week paid vacation after a year, and a week of sick leave/personal time off. The only similar benefit Williams had with MJP was one week of paid vacation time. Williams described his supervisor at the club as careful to accommodate his back injury.
In the meantime, LUBA assigned Williams a vocational rehabilitation counselor, Elier Diaz. Diaz studied Williams' FCE and scheduled an initial conference with Williams for April 30, 2002, before Williams began the Squire Creek employment. Williams, however, postponed their meeting until May 20, 2002, at which time Diaz asked about his possibly returning to work for MJP as a plumbing "utility worker." At trial, Johnson expressed a willingness to create a job to accommodate Williams' limitations, given Johnson's need for licensed plumbers. He stated the job would involve repair work on service calls. Nevertheless, no written description of the job was provided, and apparently the specific duties involved in the proposed job were never clearly detailed by Diaz to Williams' satisfaction.
Williams testified that during their discussions he told Diaz that he was "not really" interested in this proposition and declined the offer because it was vague. Williams assumed that it would include digging and other heavy work which he was unable to do. Williams described his new job benefits, particularly the availability of heath insurance, as important to him, especially given his age and health condition.
Williams met with Diaz a second time, the following month and expressed his disinterest in the possible "modified plumber's type" job. Williams believed his ability to perform plumbing jobs was limited to a supervisory capacity, and that labor intensive work would be demanded of him. Diaz said Williams repeated his satisfaction with Squire Creek's employment benefits.
Diaz advised Williams by letter dated June 26, 2002, as follows:
As you know from our prior discussions, your pre-injury employer has been considering accommodating you with appropriate employment. Mark Johnson Plumbing has agreed to make a Plumbing Utility Worker job available to you and has asked that said job be tendered to you via this correspondence. This position will pay your pre-injury wages for your pre-injury hours; and it is within the physical parameters outlined for you by Dr. Nanda.
If you wish to pursue the above-mentioned job, please report to Mark Johnson on July 11, 2002 at 9:00 a.m. ...
(Emphasis in original.) Diaz never presented the job description to Dr. Nanda *1197 for approval, but unilaterally concluded it fit within defined parameters.
Williams neither contacted MJP nor appeared at the jobsite at the appointed time. He instead opted to remain employed at the country club. At a chance meeting with Johnson on July 30, they discussed the modified position. Williams recalled Johnson saying that all the work available was "top-out" work. Such work requires frequent use of a drill for plumbing installations through framing studs. Williams testified that he told Johnson that he could not do that kind of work.
LUBA ceased paying Williams SEB's in July 2002, and Williams filed this action for compensation with the OWC. After trial, the WCJ concluded that Williams was not entitled to further SEB's because he had not attempted to perform the modified position offered by his employer at his former salary. Specifically, the WCJ said, in part:
[Williams'] contention that he was unable to physically perform the modified position with Mark Johnson cannot be given merit inasmuch as he never attempted to discover what duties the position entailed, and he never attempted to perform those duties. Claimant failed to give his former employer the same opportunity given his subsequent employer, to provide job duties within his physical limitations, and the former employer should not be penalized for the claimant's failure to do so. Mark Johnson testified he would work with claimant in the modified job duties because of his urgent need for licensed plumbers to assist him in his business. He testified he would have only required claimant to perform the lighter functions of plumbing work, and he would not have expected claimant to do anything which he was not capable of doing because of his injuries. It is unfortunate that Johnson never got the opportunity to accommodate claimant's physical limitations. If said opportunity had been given, it is very likely that claimant would have been returned to his pre-injury job earning his pre-injury salary.
The WCJ awarded Williams back pay for the difference between the amounts actually paid and the proper compensation rate of $373.33 per week. However, the WCJ denied Williams' demand for penalties and attorney fees. The WCJ cast Williams with one-half of the costs of the proceedings below. Williams now appeals.

Discussion
The findings of the WCJ are subject to the manifest error rule. Chaisson v. Cajun Bag & Supply Co., 97-1225 (La.3/4/98), 708 So.2d 375. In applying the manifest error standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551; Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993).

Denial of SEB's
Regarding SEB entitlement, La. R.S. 23:1221 provides, in pertinent part, as follows:
(3)(a) For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was *1198 customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed by multiplying his "wages" by fifty-two and then dividing the quotient by twelve.
(b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain.
(c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or employer's community or reasonable geographic region.
(ii) For purposes of Subparagraph (i) of this Subparagraph, if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.
From this provision, the claimant bears the initial burden of proving, by a preponderance of the evidence, that his injury resulted in his inability to earn 90% of his pre-injury wage, under the facts and circumstances of the case. Lee v. Schumpert, 36,733 (La.App.2d Cir.1/29/03), 836 So.2d 1214. If the claimant meets this burden, the burden shifts to the employer to prove that the claimant is physically able to perform a certain job and that the job was offered to the claimant, or that the job was available to him within his or the employer's geographic region. Id. If the employer satisfies that burden, then the claimant must show, by clear and convincing evidence unaided by any presumption of disability, that he is unable to perform the employment offered or available, solely as a result of substantial pain. Id.
The WCJ concluded that Williams failed to carry his initial burden of proving that his injury rendered him unable to earn 90% of his pre-injury wage. Nevertheless, the WCJ also went further and stated that the defendants "clearly demonstrated the existence of a suitable job, the amount of wages claimant could be expected to earn, and an actual position available." Regardless of which party's burden applied, we agree that the WCJ's conclusion regarding the reasonableness of the job position offered Williams is not manifestly erroneous or contrary to our workers' compensation law.
Section 1221 of the Act, as shown above, recognizes jobs tendered by the employer, including sheltered employment, and their effect on the reduction of the amount of SEB's. Significantly, Section 1226 of the Act, discussing the employee's entitlement *1199 to rehabilitative services, provides in subparagraph (B)(1), as follows:
The goal of rehabilitation services is to return a disabled worker to work, with a minimum of retraining, as soon as possible after an injury occurs. The first appropriate option among the following must be chosen for the worker:
(a) Return to the same position.
(b) Return to a modified position.
...
In this case, the WCJ had to determine the credibility of the employer, Johnson, and his good faith in offering Williams the modified position. His testimony indicated that Williams' expertise as a journeyman plumber was difficult to find in the job market since most experienced plumbers choose to be self-employed. Johnson also testified that to aid Williams in the job, he would assign Williams the same assistant for the heavy work who had occasionally worked with him before. Johnson testified that he was aware of Williams' limitations as set forth in the FCE and that Williams would not be expected to perform the heavy duty tasks of a particular plumbing job.
The WCJ also had a credibility decision regarding Williams' motives concerning his objections to the modified position offered by the former employer. Williams did not communicate with Diaz or Johnson after receiving the June 26 letter. He did not request a written job description nor seek to require approval by his doctor. Because of the fringe benefits of Williams' new job which do not fit within the formula for the wage computations for SEB's, the WCJ's ruling against Williams in this case was no doubt based in part on his answer on cross-examination to the following:
Q. And I take it, you were not willing to consider the possibility that Mr. Johnson, who had been your employer for two years, was willing to create a new job that you had never heard of so that you could get back to where you were financially before you got hurt? You weren't willing to consider that possibility?
A. I was satisfied with where I was.
Finally, we disagree with Williams' argument that approval of the modified position by his doctor was required. Williams cites no provision under the Act mandating such approval. The FCE had been obtained by the employer and approved by the doctor, and Johnson showed his willingness to follow the recommendations of the FCE in re-employing Williams in the modified position.
Accordingly, we find no manifest error or legal error in the WCJ's denial of SEB's under the facts and circumstances of this case.

Penalties and Attorney Fees for Undercalculation of Benefits
Williams urges that the OWC erred in failing to award him penalties and attorney fees because of the employer's underpayment of benefits. The WCJ found, and we agree, that the employer miscalculated Williams' wage benefits by the employment of the wrong wage definition under Section 1021(10)(a) of the Act. La. R.S. 23:1021(10)(a) provides, in part:
(10) "Wages" means average weekly wage at the time of the accident. The average weekly wage shall be determined as:
(a) Hourly wages.
(i) If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater; or

*1200 (ii) If the employee is paid on an hourly basis and the employee was offered employment for forty hours or more but regularly, and at his own discretion, works less than forty hours per week for whatever reason, then, the average of his total earnings per week for the four full weeks preceding the date of the accident
Calculating Williams' wages under the formula of La. R.S. 23:1021(10)(a)(ii) (omitting the partial week during which Williams was hurt), the employer apparently calculated Williams' wages to be $525 [($448.00 + $490.00 + $602.00 + $560.00) divided by 4]. Two-thirds of that amount is $350.00, the adjusted amount of benefits paid after Williams' first challenge of the amount of the benefit payments.
The evidence at trial supports the trial court's finding that Williams' benefits should be calculated under subparagraph (i) of Section 1021(10)(a) rather than subparagraph (ii). Johnson testified that Williams was a full-time employee who regularly worked 40 hours a week, with no independent discretion to work less. His wages are thus $560.00 per week (40 x $14.00), and two-thirds of that amount is $373.33, the correct compensation rate. Williams was therefore clearly undercompensated.
Former La. R.S. 23:1201(F)[1] provided for penalties and attorney fees, in pertinent part, as follows:
F. Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. Penalties shall be assessed in the following manner:
(1) Such penalty and attorney fees shall be assessed against either the employer or the insurer, depending upon fault. No workers' compensation insurance policy shall provide that these sums shall be paid by the insurer if the workers' compensation judge determines that the penalty and attorney fees are to be paid by the employer rather than the insurer.
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
An employee has the burden of proving his entitlement to statutory penalties for the employer's failure to timely pay workers' compensation benefits. Bolton v. Mike Fleming Const., 36,521 (La.App.2d Cir.12/11/02), 833 So.2d 1177. To reasonably controvert a workers' compensation claim so as to avoid imposition of penalties and attorney fees, the employer and its insurer must provide sufficient factual and medical information to reasonably counter the evidence provided by the claimant. Id. To meet this standard, the employer must have some "valid reason or evidence upon which to base his denial of benefits." Feild v. General Motors Corp., 36,339 (La. *1201 App.2d Cir.09/18/02), 828 So.2d 150. The court must determine whether the employer "engaged in a non-frivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed." Feild, supra. Penalties are stricti juris and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay. Bolton, supra. The WCJ has great discretion in deciding whether to award or deny penalties and attorney fees and such decision will not be disturbed absent abuse of that discretion. Fisher v. Lincoln Timber Co., 31,430 (La.App.2d Cir.1/24/99), 730 So.2d 973.
In this case, when Williams first challenged the underpayment before the OWC, the employer responded to his challenge by correcting its initial error of including the partial week of the accident in the calculation of wages. It did not, however, recalculate benefits under the correct subparagraph of La. R.S. 23:1021(10)(a). The WCJ found this second error excusable because of the variance in the amount of hours worked by Williams in the weeks prior to the accident. Additionally, we note that the record reflects that the $350 per week rate was the wage benefit amount determined by both parties after mediation of Williams' first claim before the OWC. Under these facts, we find no abuse of discretion by the WCJ in the refusal to award penalties and attorney fees.

Court Costs
Finally, Williams argues that the WCJ erred by casting him with half of the cost of the proceeding below. La. C.C.P. art. 1920 provides that the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable. Williams was only partly successful in his demands, so we find no reversible error in the trial court's allocation of costs. Compare Thomas v. Irving Place Rehabilitation Care Center, 34,064 (La.App.2d Cir.11/1/00), 771 So.2d 820.

Conclusion
For the above reasons, the judgment of the OWC is affirmed. Costs of this appeal are assessed to appellant, Jimmy Williams.
AFFIRMED.
APPLICATION FOR REHEARING
Before STEWART, CARAWAY, PEATROSS, DREW, and MOORE, JJ.
Rehearing denied.
NOTES
[1] The statutes governing penalties and attorney fees in compensation cases changed, in some ways materially, on July 3, 2003, when La. R.S. 23:1201 was amended and La. R.S. 23:1202.2 was repealed by the enactment of Act 1204 of 2003. However, the penalty provisions in effect at the time of the alleged denial of benefits control. Gay v. Georgia Pacific Corp., 32,653 (La.App.2d Cir.12/22/99), 754 So.2d 1101.